A01A2469. PAYNE v. HARBIN.
A01A2470. ROME BROKERS, INC. v. HARBIN.
A01A2471. POWERS v. HARBIN.
A01A2472. KELLEY v. HARBIN.
(562 SE2d 772)

BLACKBURN, Chief Judge.

In these four related interlocutory appeals regarding fraudulent inducement to sell certain mountain property, Dwight Payne, Rome Brokers, Inc., Nicholas D. Powers, and James M. Kelley (defendants) appeal the trial court's denial of their motion for summary judgment, contending that the plaintiff, Elizabeth Warner Harbin, presented insufficient evidence to show that they conspired to convince her to sell the property at a depressed value. Because the evidence indicates that, despite Harbin's claims, she received the benefit of the specific bargain chosen by her, we find that the trial court should have granted summary judgment to defendants and reverse.

> Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). A de novo standard of review applies to an appeal from a grant [or denial] of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.

*Matjoulis v. Integon Gen. Ins. Corp.*[1]

This case arose out of the sale of real property located on Bogan Mountain, which was originally owned by Dr. William Harbin.[2] On October 5, 1990, Dr. Harbin, whose health was failing, transferred the Bogan Mountain property to his wife, Elizabeth, who is the appellee here. David Bain, a neighbor of the Harbin family, grew up on a farm at the foot of Bogan Mountain and, as an adult, expressed an interest in buying the Bogan Mountain property. In 1994, Bain made an offer to the Harbins to purchase Bogan Mountain for $550,000. This offer to purchase the property was rejected. Dr. Harbin did, however, lease hunting rights on Bogan Mountain to Bain.

In 1995, Mrs. Harbin and her four daughters decided to sell the Bogan Mountain property. At their request, Kelley, an employee of Rome Brokers, appraised the property, and he came up with a retail value of $496,000. The following year, Mrs. Harbin contacted Kelley and asked him to sell the property by means of a "pocket listing," a private listing without advertising or any official posting. Kelley, in

---

[1] *Matjoulis v. Integon Gen. Ins. Corp.*, 226 Ga. App. 459 (1) (486 SE2d 684) (1997).
[2] Dr. Harbin is now deceased.

turn, told his partner, Harry Anderson, about the Harbins' decision to sell, and Anderson then contacted Powers, one of his clients.

Although Powers was interested in purchasing the property, he wanted to contact Charles O'Hearn, a friend from south Georgia, about financing the purchase. O'Hearn told Powers that, although he did not personally have the money to purchase the land, Powers could use O'Hearn's name in negotiating the sale and financing of the deal. O'Hearn informed Powers, however, that he would not sign any documents relating to the sale because he did not wish to be legally obligated in any way. Powers agreed to this scenario and moved forward with the transaction.

In March 1996, Powers, using O'Hearn's name, made an offer to purchase the Bogan Mountain property for $429,520. Upon receiving the offer, Louisa Harbin Hunter, one of the Harbin daughters, contacted Bain to inform him they intended to sell the Bogan Mountain property to a man from south Georgia and that as a result his hunting lease might be affected. At that point, Bain, who harbored a sentimental attachment to the land, offered $650,000 to purchase the property.

After hearing Bain's offer, Louisa Harbin Hunter contacted Kelley to ask him about Bain's credit rating. According to Louisa Harbin Hunter, Kelley offered to contact a local banker to determine whether Bain could fund his offer to purchase the property. Kelley then contacted Michael Baker at Regions Bank, who told Kelley that, although Bain's credit was good, based upon the appraised value of the property, Bain would be able to borrow only around $300,000 to purchase the property. The rest would have to be paid in cash.

Louisa Harbin Hunter admitted that no effort was made to look into any assets Bain might have which would help him raise the rest of the necessary funds to meet his offer, and she did not ask Kelley to do any more research in the matter. Louisa Harbin Hunter further testified that, based upon Kelley's initial research, which consisted of Kelley's conversation with Baker, she, her mother, and her sisters felt it would be better to sell to someone who was a "sure thing." This position was also evinced by the testimony of Elizabeth Harbin Hunter, another daughter of the Harbins, that the Harbins decided to pursue O'Hearn's offer instead of Bain's because they were concerned that Bain might not be able to raise the purchase money.

With regard to the actual sale of the property, O'Hearn's name was on all of the offers and counteroffers, but he never actually signed any of the papers and was not present at closing. In actuality, and pursuant to the agreement between Powers and O'Hearn, Powers was purchasing the property. Shortly after Powers and Harbin executed their sales contract, Bain contacted Powers about purchasing the property from him. Bain offered Powers $700,000 for the

property, which Bain readily admits was in excess of the property's fair market value. Powers accepted the offer and then contacted his attorney, Dwight Payne, to prepare a sales contract. On April 16, 1996, Powers and Bain signed a purchase agreement for $700,000.

The closing on the Harbin-O'Hearn sale took place in May 1996. The documents were taken to Harbin at home, and she signed the documents in front of her attorney, Virginia Harmon, and Kelley. At that time, Payne agreed to secure the signature of O'Hearn, but told them O'Hearn would not be present at closing. Sometime thereafter, Anderson admits that, while at Payne's office, he signed the name "Charles O'Hearn" to several closing documents, including a warranty deed from O'Hearn to Bain, a quitclaim deed from O'Hearn to Bain, and a closing statement. After these transactions, the Powers-Bain deal was also closed. Subsequently, O'Hearn signed a quitclaim deed to Bain in order to clear up any possible title questions caused by Anderson signing the documents.

Harbin now argues that the defendants must pay her the difference between the purchase price paid by Powers and the purchase price paid by Bain, contending that defendants defrauded her by convincing her not to sell to Bain, using a straw man to purchase the property at a depressed price, and then selling the property to Bain themselves. For the same reason, Harbin argues that the defendants were negligent, breached their contract with her, and breached their fiduciary duties. The undisputed evidence, however, does not support Harbin's claims, as Harbin ultimately received the benefit of the bargain chosen by her.

To establish fraud, Harbin must prove five elements: "(1) a false representation or omission of a material fact; (2) scienter; (3) intention to induce the party claiming fraud to act or refrain from acting; (4) justifiable reliance; and (5) damages." *ReMax North Atlanta v. Clark*.[3]

It is undisputed that Powers used a straw man, O'Hearn, to negotiate the deal with the Harbins. However, it is also undisputed that the Harbins did not care about the actual identity of the purchaser of the property. All they knew was that the purchaser was a man from south Georgia, and they made no further inquiries. Harbin got the benefit of the bargain she struck. She suffered no harm or damages as she received everything she contracted to receive in the sales contract.

Although the Harbins now vociferously point to the use of a straw man as grounds to undo their poor business deal, their allegations of fraud and deceit lack merit. Harbin had no idea who was

---

[3] *ReMax North Atlanta v. Clark*, 244 Ga. App. 890, 893 (537 SE2d 138) (2000).

purchasing her property. And, the identity of the purchaser was not a relevant factor to her, just that the purchaser had the ability to pay in cash. Based on this latter qualification, Harbin and her daughters made the conscious decision to reject Bain's offer and accept the offer from Powers. Ultimately, therefore, Powers was the one taking the risk as to whether Bain would be able to come up with the cash to meet his offer. It was undisputed that Bain's offer was well over the appraised value and financing would be a risk. However, that was a risk the Harbins chose not to take. They cannot now change their minds.

There is no evidence that the information given by Kelley to the Harbins was false or misleading. To the contrary, it appears to be the truth. The bank, considering the appraised value of the property, would have been willing to lend only $300,000 on the land. Bain was going to have to come up with more than twice that to meet his offer to Hunter. Kelley and the Harbins felt this risk was greater than they wanted to take. However, there is no evidence that Kelley committed fraud, deceit, or negligence in his advice to the Harbins.

Further, although Rome Brokers facilitated both closings and knew that Powers was the actual buyer, again that information was irrelevant to the Harbins as they never even knew or cared about who the person purchasing the property was until after the closing had taken place. Rome Brokers, like Powers its client, was also taking the risk that Bain would be able to come up with the cash to complete his transaction with Powers. This in no way constitutes fraud, deceit, or negligence on the part of Rome Brokers.

This appears to be a case of cold feet and subsequent regret. After the Harbins realized that Bain was able to fund his offer and recognized their mistake, they believed they were wronged. However, they had every opportunity to discuss Bain's offer with him and to seek verification from Bain as to his ability to obtain the necessary funds to meet his offer. Instead, the Harbins chose to ask Kelley to research Bain's credit rating. Kelley did so and determined Bain would not be able to borrow anywhere near the necessary amount he needed to purchase the property at the offered price. That information was never found to be false. Further, it is undisputed that O'Hearn's offer was reasonable based upon the fair market value of the property. O'Hearn was a sure thing, and the Harbins achieved their bargained-for result.

The claim against Payne consists of a legal malpractice claim; however, there is no evidence of an attorney-client relationship between Payne and the Harbins. The Harbins were represented by Harmon, and they did not request any legal services from Payne. See,

e.g., *Legacy Homes v. Cole*.[4] Further, once again, there is no evidence that the Harbins were harmed. They got the bargain they struck.

The factual issues the trial court found to be in dispute appear to have no bearing on the efficacy of Harbin's claims of fraud and deceit. Whether O'Hearn ever intended for Anderson to sign his name to the documents has no relevance as to whether the Harbins got the benefit of their bargain. Further, there was no breach of the sales contract with the Harbins as they got everything they were entitled to under the terms of the contract. And, for the same reason, Harbin's claims against the defendants for negligence and breach of a fiduciary duty must also fail, as Harbin, who had the relevant facts at her disposal, received exactly what she asked to receive.

The trial court erred in denying summary judgment.

*Judgments reversed. Pope, P. J., and Mikell, J., concur.*

DECIDED MARCH 21, 2002.

*Hawkins & Parnell, H. Lane Young II, Carl H. Anderson, Jr.*, for appellant (case no. A01A2469).

*Tisinger, Tisinger, Vance & Greer, J. Thomas Vance, Kenneth B. Crawford*, for appellant (case no. A01A2470).

*David G. Archer, Edward K. Lovell*, for appellant (case no. A01A2471).

*Minor, Bell & Neal, William F. Jourdain, Robert G. McCurry*, for appellant (case no. A01A2472).

*Davis, Matthews & Quigley, Baxter L. Davis, Kurt A. Kegel, Davidson & Strain, William E. Davidson, Jr.*, for appellee.

---

[4] *Legacy Homes v. Cole*, 205 Ga. App. 34 (421 SE2d 127) (1992).