A02A0698. BLANEY et al. v. O'HERON et al.
(568 SE2d 774)

POPE, Presiding Judge.

Dr. Thomas D. Blaney and his wife, Jean Blaney, appeal from the trial court's grant of summary judgment to defendants Dr. Sara O'Heron and the Emory Clinic, Inc. on the Blaneys' claims that they were falsely accused of sexually molesting their two granddaughters. We reverse.

The accusations arose after the children, then two and four, stayed with their grandparents over the weekend of September 19-21, 1997.[1] Two days later, Carla Blaney, the girls' mother and the Blaneys' daughter-in-law, took the girls to an Army physician at Ft. Gordon and reported her suspicion that the children may have been

---

[41] (Punctuation omitted.) *Christensen v. State,* 245 Ga. App. 165, 169 (8) (537 SE2d 446) (2000).

[42] See id.

[43] See *Miller,* supra.

[1] Our review of the record is de novo, and we view the evidence in the light most favorable to the Blaneys, as the nonmoving parties. *Payne v. Harbin,* 254 Ga. App. 402 (562 SE2d 772) (2002).

subjected to sexual abuse by their grandfather. The mother based her suspicions upon conversations with the children and her observations of their behavior. The Army doctor's physical exam found no evidence of abuse. The Blaneys' son, Mike, who is also a doctor, returned from out-of-town about one week later, and he, too, noticed nothing abnormal when he examined the girls.

During the same period, Carla Blaney also arranged for her children to be evaluated by an Army social worker. In accordance with Army protocol, the social worker reported the allegations of abuse to the Columbia County Department of Family & Children Services. That department, in turn, reported the matter to the DFACS office in Fayette County, where the Blaneys resided.

Carla Blaney also directly contacted a detective at the Fayette County Sheriff's Department, who recommended that she take the girls to be examined by O'Heron at the Fayetteville office of the Emory Clinic. On October 16, 1997, O'Heron performed physical examinations and conducted interviews with the children and discussed the situation with Carla Blaney. The Fayette County detective was also present. O'Heron subsequently reported that she found physical evidence of sexual abuse of one of the girls, but that her examination of the other child was normal. In addition, she recommended to the detective that Thomas and Jean Blaney be arrested.

The Fayette County Sheriff's Department executed arrest and search warrants the next day. Although one grand jury initially indicted the Blaneys on a number of charges, the case was later taken over by a new assistant district attorney, who conducted further investigation and resubmitted the matter to the grand jury in March 1999. The second grand jury issued a "no bill" on all counts. On March 9, 1999, the State of Georgia entered a nolle prosequi on the charges from the first indictment.

The Blaneys subsequently filed this action in DeKalb County Superior Court against O'Heron and the Emory Clinic, asserting claims for malicious prosecution, professional malpractice and ordinary negligence. The trial court granted summary judgment finding that O'Heron and the Emory Clinic were protected by statutory good faith immunity under OCGA § 19-7-5 (f). The Blaneys appeal, asserting that the trial court erred in granting summary judgment on their claims because the record contains sufficient evidence to raise a jury question as to whether O'Heron acted in good faith in connection with her report and in connection with her later testimony concerning the alleged child abuse.

Georgia law requires that a physician who has reasonable cause to suspect child abuse must report the abuse to the appropriate authorities. OCGA § 19-7-5 (c) (1) (A). And the knowing or wilful failure to do so constitutes a misdemeanor. OCGA § 19-7-5 (h). More-

over, Georgia law provides a qualified immunity for those who make such a report in good faith:

> Any person . . . participating in the making of a report or causing a report to be made to a child welfare agency providing protective services or to an appropriate police authority pursuant to this Code section or any other law or participating in any judicial proceeding or any other proceeding resulting therefrom shall in so doing be immune from any civil or criminal liability that might otherwise be incurred or imposed, provided such participation pursuant to this Code section or any other law is made in good faith. Any person making a report, whether required by this Code section or not, shall be immune from liability as provided in this subsection.

OCGA § 19-7-5 (f). The issue of "good faith" is usually for the jury, but in cases such as this where important policy decisions underlie the grant of good faith immunity, "greater scrutiny should be given to evidence of whether a defendant acted in good faith" to determine whether the issue can be resolved as a matter of law. *Thomas v. DeKalb County*, 227 Ga. App. 186, 189 (2) (489 SE2d 58) (1997).

A defendant generally has the burden of establishing the affirmative defense of immunity. *Heath v. Emory Univ. Hosp.*, 208 Ga. App. 629, 631 (2) (431 SE2d 427) (1993). Here, O'Heron submitted an affidavit in support of the motion for summary judgment stating her basis for making the report of the alleged child abuse and asserting that she acted in good faith. When a moving party makes a prima facie showing that she is entitled to judgment as a matter of law, the opposing party must come forward with rebuttal evidence in order to avoid summary judgment. *Threadmill, Ltd. v. First Union Nat. Bank &c.*, 207 Ga. App. 688 (428 SE2d 685) (1993). Accordingly, the Blaneys bear the burden on summary judgment of rebutting O'Heron's affidavit.

This Court has held that in order to overcome a claim of good faith immunity, a plaintiff must demonstrate more than mere professional negligence or bad judgment. *Michaels v. Gordon*, 211 Ga. App. 470, 473 (2) (439 SE2d 722) (1993). Rather, there must be a showing that the physician did not act in good faith. "Good faith" has been defined as "a state of mind indicating honesty and lawfulness of purpose; belief that one's conduct is not unconscionable or that known circumstances do not require further investigation." (Citation and punctuation omitted.) *Anderson v. Little & Davenport Funeral Home*, 242 Ga. 751, 753 (1) (251 SE2d 250) (1978).

Although this definition is expressed in subjective terms, this Court has employed an objective test in other contexts involving good

faith and a duty of reasonable inquiry. See, e.g., *Kendrick v. Funder-burk*, 230 Ga. App. 860, 864 (3) (498 SE2d 147) (1998) (duty of reasonable inquiry in asserting a good faith claim establishes an objective good faith requirement). Here, the reporting statute requires "reasonable cause to believe that a child has been abused" before an individual is required to report those suspicions. OCGA § 19-7-5 (c). Accordingly, anyone reporting child abuse under this statute must act with reasonable good faith, judged in light of all the circumstances, before immunity will attach. See *Dunning v. Paccerelli*, 63 Wash. App. 232, 240 (818 P2d 34) (1991) (construing similar statutes requiring "reasonable cause to believe" before reporting mandated and "good faith" immunity provision).

To establish that a reporting physician has not acted with such objective good faith requires evidence of bad faith. *Michaels v. Gordon*, 211 Ga. App. at 473 (2) (b) (" 'Bad faith' is the opposite of 'good faith.' ") (punctuation omitted). "Bad faith" has been defined as:

generally implying or involving actual or constructive fraud; or a design to mislead or deceive another; or a neglect or refusal to fulfill some duty, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. "Bad faith" is not simply bad judgment or negligence, but it imports a dishonest purpose or some moral obliquity, and implies conscious doing of wrong, and means breach of known duty through some motive of interest or ill will.

(Citations and punctuation omitted.) *Baldwin County Hosp. Auth. v. Trawick*, 233 Ga. App. 539, 541 (504 SE2d 708) (1998). Therefore, bad faith may encompass a breach of duty motivated by one's own interests or some other "sinister" or dishonest purpose.

The Blaneys assert that the record in this case raises a question as to whether O'Heron's report was motivated by her own self-interest in promoting herself to local authorities as an expert in child abuse, rather than in the good faith exercise of her professional duty. They note that her typed report of her examination contains allegations that go beyond those reported to the Army doctors to include claims of vaginal and anal penetration. The report also states that her physical exam, which occurred twenty-six days after the abuse allegedly occurred, supports these allegations, despite the fact that the Army doctor who examined the children three days after the alleged incident found no such evidence. They also note the typed report, which was dictated four days after the exam, gives detailed descriptions of her interviews with the children, including quotes, but her handwritten notes made the day of the interview do not con-

tain such detail. Moreover, O'Heron's records from the date of the exam contain no notes regarding the physical exam, in contrast with the detailed description contained in the typed report dictated four days later.

The Blaneys further rely upon evidence of O'Heron's actions in later legal proceedings to support their claim that she was acting with an improper motive. The charges against the Blaneys became an issue in the subsequent divorce proceedings between Carla and Mike Blaney, the children's parents. O'Heron provided affidavits on Carla Blaney's behalf. In particular, she submitted an affidavit on April 17, 1998, in response to one from the Army physician who originally examined the girls and found no physical evidence of child abuse. In that affidavit, O'Heron states that the Army doctor's medical conclusions are "100% wrong," that he was untrained in the medical aspects of child abuse and that his examination was "superficial." But the evidence presents a question as to whether O'Heron had even reviewed the doctor's records at the time she gave this affidavit, even though the affidavit states that she had. In her deposition, O'Heron could not state conclusively when she had reviewed the Army doctor's examination report, although the doctor's records do appear in Emory Clinic's files. Nor is there any evidence that she had any knowledge of the Army doctor's background or training prior to questioning his expertise.

O'Heron also states in the affidavit that she concluded from her October 16, 1997 examination of the children "that the injuries sustained by them in mid to late September were compatible with my physical findings in terms of state of healing." She then said that she could state "categorically" that the injuries had not occurred within seven to ten days prior to her examination. The Blaneys argue that this statement falsely implies that O'Heron found physical evidence of abuse on both children, when her written report showed that the exam of one of the girls "was completely normal."

They also assert that by purporting, some 26 days after the fact, to be able to pinpoint the time of the abuse to the period the children were with their grandparents, O'Heron went beyond mere negligence into the realm of advocacy to justify her original findings and arrest recommendation. In support of this argument, they note that several other physicians, who have expertise in child abuse cases and who reviewed O'Heron's reports and affidavits, have expressed more than merely a medical disagreement with O'Heron's findings and judgment. These doctors stated that they were "utterly astonished," "appalled" and "horrified" that a physician would claim to be able to date the occurrence of the abuse back more than 20 days.

In addition, O'Heron stated in this affidavit that she had used a colposcope, to examine the girls without stating when the instrument

was used. But the guardian ad litem for the children had previously asked O'Heron whether she had used a colposcope during the October 16 exam, and O'Heron admitted that she had not. Neither her office notes, her written report nor Emory records from the October examination reflect the use of a colposcope, although they do for a later examination in March 1998. The Blaneys assert that O'Heron was falsely implying that she used the instrument in the October examination in order to bolster her findings in comparison with those of the Army doctor.

And they argue that although O'Heron represented herself to the family court to be an expert in the area of child abuse, the résumé she submitted contains misrepresentations as to her prior experience and training. They point to a number of discrepancies between the entries on her résumé and other evidence in the record in support of this argument.

The Blaneys argue that, when considered together, all these instances demonstrate that O'Heron was more concerned with defending her reputation than presenting a clear and accurate picture of her examination to judicial authorities. And they assert that this argument is further supported by evidence from a prior controversial incident in which O'Heron reported child abuse to authorities.

O'Heron previously was sued in Texas by the parents of a teenage girl after she reported to authorities that the girl had been sexually abused by her father and recommended that the girl remain in protective custody. The girl denied any abuse or any prior sexual activity. O'Heron reported, however, that her examination had revealed that girl had no hymen and that there was evidence of vaginal penetration. But in examinations conducted both before and after O'Heron's, two physicians reported that the girl's hymen was intact and that there was no evidence of penetration. Civil proceedings against the parents were subsequently dismissed, and the girl was released back into their custody. Although the parents' pro se lawsuit was also later dismissed, the local district attorney issued instructions to child protective services not to use O'Heron's services in future child abuse cases as a result of the incident. The Blaneys assert that this evidence shows a course of conduct and motive by O'Heron to represent herself to local authorities, first in Texas then in Georgia, as a child abuse expert and then to attempt to maintain that status by reporting that she found evidence in support of the authority's cases.

O'Heron and the Emory Clinic assert, however, that evidence of O'Heron's actions after making the initial report are irrelevant, as is her conduct in any unrelated matters. They state that the only issue is whether O'Heron submitted her initial report in good faith. But as a general rule, issues of good faith, motive and intent are not "easily

susceptible of direct proof," but may depend upon other, less direct evidence: "frequently the state of mind accompanying the doing of an act is illustrated by other acts of a similar nature, done or proposed by the defendant in such a way as to indicate a general practice or course of conduct, or as to display motive, knowledge, intent, good faith, bad faith, and a variety of other such things." (Citations and punctuation omitted.) *Thomas v. DeKalb County*, 227 Ga. App. at 189-190 (2).

Moreover, evidence of prior actions could be relevant to the issue of malice, which is an element of the Blaneys' malicious prosecution claim. Such evidence is relevant where it demonstrates that a defendant was aware from previous experience that his actions in the past had resulted in similar injuries, but nevertheless continued in his course of conduct "in utter indifference to the consequences." *Wood v. D. G. Jenkins Homes*, 255 Ga. App. 572, 574 (565 SE2d 886) (2002). See also *Worn v. Warren*, 191 Ga. App. 448-449 (1) (382 SE2d 112) (1989); *Gunthorpe v. Daniels*, 150 Ga. App. 113, 114-115 (3) (257 SE2d 199) (1979).

O'Heron's subsequent actions are also relevant to the malicious prosecution claim. The Blaneys assert that O'Heron became a prosecutor of the criminal charges against them when she went beyond mere reporting to recommend that the Blaneys be arrested. Under Georgia law, a party runs the risk of subjecting himself to liability for malicious prosecution where he, directly or indirectly, urges that criminal proceedings be instigated:

> The law draws a fine line of demarcation between cases where a party directly or indirectly urges a law enforcement official to begin criminal proceedings and cases where a party merely relays facts to an official who then makes an independent decision to arrest or prosecute. In the former case there is potential liability for false imprisonment or malicious prosecution; in the latter case there is not.

(Citations omitted.) *Ginn v. C & S Nat. Bank*, 145 Ga. App. 175, 178 (3) (243 SE2d 528) (1978). Therefore, a question of fact exists in this case as to whether O'Heron submitted herself to potential liability by urging the Fayette County detective to arrest the Blaneys.

Of course, to sustain their claim for malicious prosecution, the Blaneys must prove all the elements of the claim: "(1) prosecution for a criminal offense instigated by defendant; (2) issuance of a valid warrant, accusation, or summons; (3) termination of the prosecution in favor of plaintiff; (4) malice; (5) want of probable cause; and (6) damage to the plaintiff. OCGA § 51-7-40." (Citations omitted.) *Willis v. Brassell*, 220 Ga. App. 348, 350 (469 SE2d 733) (1996).

The Blaneys assert that O'Heron lacked probable cause in asserting her claims against them, and such an issue is generally for the jury. *Willis v. Brassell*, 220 Ga. App. at 353 (4). And even if a jury finds that a defendant initially had probable cause to instigate prosecution, if evidence shows that a defendant may have later discovered that the claims lacked probable cause, yet persisted in the prosecution, an issue of liability remains:

> Even if on instigating the prosecution the prosecutor had probable cause at the commencement, if he afterwards acquired knowledge, or the reasonable means of knowledge, that the charge was not well founded, his continuation of the prosecution is evidence of the want of probable cause, requiring that the question be submitted to the jury.

(Citations and punctuation omitted.) *Fuller v. Jennings*, 213 Ga. App. 773, 776-777 (1) (445 SE2d 796) (1994). Probable cause cannot exist if a defendant "knew that the facts stated to the law enforcement official were false or if he failed to make a fair, full, and complete statement of the facts as they existed, or if he concealed facts. The defendant's belief then could not possibly be 'honest' or 'reasonable.'" (Citations omitted.) *Willis v. Brassell*, 220 Ga. App. at 353 (4).

Thus, for example, if the jury were to conclude from the evidence that O'Heron's April 1998 affidavit contained misrepresentations as to the methodology and conclusions in her initial report, this could raise a question of fact as to whether, at the time of that affidavit, she was acting in good faith in continuing to defend her physical examination, thus furthering the Blaneys' prosecution.[2] In addition, such a finding could also raise a question as to whether the initial report was made in good faith or whether a later misrepresentation of the methodology and conclusions involved undermines the report's validity.

Even if an individual subjectively believes that child abuse has occurred, an issue of bad faith would arise if in reporting his suspicions, that individual intentionally misrepresented the basis upon which he relied in reaching his conclusions. Under such circumstances, it would be up to a jury to determine whether the individual was merely exercising bad judgment or negligence, or whether the individual's actions "import[ ] a dishonest purpose or some moral obliquity, and impl[y] conscious doing of wrong." (Citations and punctuation omitted.) *Baldwin County Hosp. Auth. v. Trawick*, 233 Ga.

---

[2] We note that O'Heron has denied any misrepresentations and offered explanations for some of the statements in her affidavit, but these explanations simply raise issues of fact for the jury.

App. at 541. We caution, however, that to survive summary judgment, the evidence must show more than mere disagreement with a physician's conclusion that child abuse has occurred. Rather, the evidence must present fact issues regarding the doctor's motive, intent or honesty in reporting those conclusions.

In this case, we find that the record, when considered as a whole, presents issues of fact as to whether O'Heron is entitled to good faith immunity. In reaching this decision, we are mindful of the serious policy considerations behind OCGA § 19-7-5 (f). The importance of encouraging physicians and others responsible for the welfare of children to report their reasonable suspicions of child abuse cannot be overemphasized. But the privilege granted by the General Assembly is not absolute. Here, the evidence as to O'Heron's subsequent testimony and prior actions raises material issues of motive, intent, honesty and "moral obliquity." Where such issues exist, summary adjudication is not appropriate. See generally *Catterton v. Coale*, 84 Md. App. 337, 343 (I) (579 A2d 781) (1990); *Martin v. County of Weld*, 43 Colo. App. 49 (598 P2d 532) (1979). Cf. *Purcell v. Breese*, 250 Ga. App. 472 (552 SE2d 865) (2001) (holding summary judgment not warranted under statute granting good faith immunity to physicians who fail to comply in good faith with statutory discharge procedures).

*Judgment reversed. Ruffin and Barnes, JJ., concur.*

DECIDED JULY 3, 2002 —
RECONSIDERATION DENIED JULY 19, 2002

*Moraitakis, Kushel & Pearson, Nicholas C. Moraitakis, Albert M. Pearson III*, for appellants.

*Allen & Weathington, Hunter S. Allen, Jr., Kara A. Hicks*, for appellees.